Good morning, Your Honors. May I please the Court? My name is Thomas Landry. I represent the appellants in this matter, the New England Carpenters Central Collection Agency, as well as numerous affiliated or related employee benefit funds, which for the purpose of argument today I'll simply refer to as the benefit funds. I would respectfully request two minutes for rebuttal. Sure. Thank you. The matter comes before this Court as an appeal of a final judgment by the District Court finding that Labonte Drywall had effectively terminated its collective bargaining relationship with the union in this case, and the Court later found was therefore not entitled to submit to an audit for any period of time which was requested. The benefit funds would submit to the Court that the District Courts had committed error, which I will lay out in three basic points, and for those reasons the judgment below should be vacated and judgment should be entered in favor of the appellants. The first point which I will address with the Court is that the District Court erred in concluding that the 3-4-2007 letter was a matter of fact, that no notice was ever provided to the union in terms of this letter. No notice of termination was ever provided to the union. That's contained within paragraph 11 of the Court's findings of fact. In the collective bargaining agreement itself, the expiration language, Article 31, specifies, and this is within the appendix page 63, that notice the parties of course to the collective bargaining agreement are the employer, in the union, not the employee benefit funds, the third party beneficiaries in this case. In order for a proper termination to occur, one party to the agreement must provide written notice of termination to the other. That never happened here. Instead what the Court did was it made this subsequent leap and referred to a joint endeavor theory, which may be perhaps some sort of argument consistent with agency, but it wasn't quite clear. In any event, in doing so, the Court committed error of law by not adhering to the AMAX-Cole and Sprogeny line of cases, which stand for the proposition that an employee benefit fund and the union are two separate legal entities. There was no reason here to join the two together and to say that notice, in this case, the only, by the way, too, I will note that the only notice or indication of the recipient in the record was a payroll auditor for the benefit funds. We're not talking about someone who wore two caps, so to speak, and was a business agent for the union or was in some position of significant authority. This was a rank and file employee that this letter was supposedly sent to. The District Court took the view, it looked at the way in which the union conducted itself subsequent to the provision of this April 2007 letter and said it's clear from the way in which the union conducted itself that they understood that this April letter, that they were aware of it, they understood its significance, they understood it to be a termination letter, and so the court took the view that, yeah, it was not much of a letter and perhaps it did not formally comply with provisions in the collective bargaining agreement, but it was actual notice and the union conducted itself accordingly. What prevented the court from taking that view of the facts and the law? I think I'll address that in two ways. First of which is that as a matter of law, the court is limited in its review of whether or not termination in this case was presented or the intent to terminate was provided, and specifically I'll refer to the Louisiana Bricklayer's case, the Fifth Circuit case, which I cited within my brief, and several cases along that line that cite to the position or put forward the position that the court is limited to a superficial inquiry here when it comes to whether or not there's actual termination. But more than that, though, that the inquiry is limited or must be asked the question, was the termination clear and unequivocal? Here, the court goes so far as to even say, I think by acknowledging the fact that it wasn't that, saying it was sufficiently clear to warrant, not termination, but to warrant, as the court says within the addendum at page 11, some responsive inquiry by the union or the funds. And I would submit respectfully to the court that that goes well beyond the ability of the district court here in analyzing and reviewing whether termination is appropriate in these cases. But doesn't your argument address the case in which the party to be charged is claiming afterwards, well, we didn't know, or we couldn't be sure? Here, as Judge Lopez said in his question, we're dealing with a party who, in fact, knew well enough to act consistently with the conclusion that, in fact, there had been a termination. And isn't that a different case, in effect, from the authority that you're relying on? Respectfully, I don't believe so. I believe that, again, that the analysis here needs to be confined in terms of looking at it from a superficial inquiry to the writing itself, period. And if the answer there is based upon a review of the writing itself does not provide clear and unequivocal notice or intent of termination, that's the end of the analysis. But it can't be totally right. Suppose, then, the union gets something that, on a superficial inquiry, is not termination. And they write back, thank you for your termination letter. That's an interesting question. And I'll acknowledge that. And whether or not that would, in itself, would constitute the union's termination, I suppose, is another question. But sufficiently dissimilar here that I don't know that it's enough. Well, I guess that the question is, how dissimilar is it? Because the district court, on this line of questions, is about accepting your point about the superficial inquiry. Does the evidence of actual notice and action consistent with that actual notice change the analysis in any way? No, I don't believe it does. And I guess, why not? Is that partly is it that there's no evidence that they actually got notice? And there's no evidence that their actions, even though seemingly consistent, really show that they understood that there was a termination? Yes, thank you. And that would be my position here. That if you look at the record and you look at the facts upon which the court relied to say that the union somehow had notice or acted consistently with a termination notice, that those facts, in fact, don't support that conclusion. First of which is that there were several visits, I believe, that you'll find within the record of the union to a job site. One of the main witnesses for Labonte was Danny Labonte. However, Danny Labonte was not an owner or an officer of Labonte Drywall. He, in fact, was the owner of CDB Drywall, another drywall company, which there were some questions, as you know from the record, in terms of whether or not there was some sort of alter ego relationship here. But within the record itself, Mr. Labonte, Danny Labonte, when asked, well, who do you think that the union came to visit? He said, me. So there was no evidence indicating that the union was seeking to organize Labonte Drywall is my point. The second point, though, is that I believe Judge Lopez used the term earlier logical fallacy. There is some evidence in the record and some back and forth testimony that the benefit funds themselves would no longer send out wage and benefit information to employers which were no longer signatory. And this is something that the district court relied upon to say that this, again, was action consistent with a termination. But the flip side of that is that this is an organization that has well over 3,000 signatory contractors, approximately 600 to 800 active contractors. And the fact that it may not have sent out a wage or benefit form during a particular year to a contractor isn't by itself indicative of its knowledge that there was a termination. Yes, they sent out very specific letters urging Labonte to rejoin the union. That certainly indicates an awareness that they're no longer signatories to an agreement. They're urging them to rejoin. That's the very language used in those letters, is it not? I do respect your honor, and I don't believe so. I'm not familiar with any letters from the union indicating that they wanted Labonte to rejoin. No, I don't believe there's any evidence in the record to that effect. Let me... If I might, it seems to me the logic of your position is that if the expiration provision in Article 31 of the Collective Bargain Agreement controls, your position is that Labonte could not terminate the statewide agreement until August 31 of 2009. Is that your position? That's correct, your honor. Doesn't that sort of render meaningless or superfluous, which is I guess the way the other side characterizes it, the duration provision of the statewide agreement itself? It seems there's no purpose served by that provision if it means nothing more than the expiration provision, Article 31, completely controls the ability and the way in which Labonte has to terminate the statewide agreement. Right, which is consistent with the operation of contractors and unions in the construction world. In other words, it's not unusual for there to be a letter of assent, as the Court is well aware, or in this case referred to as a statewide agreement, which is very brief, typically a one-page document, which then refers to language within the Collective Bargain Agreement itself. In this case here... So this right to terminate is really illusory then. There is no right to terminate. If Labonte the expiration provision of the Collective Bargain Agreement controls. Isn't that, again, the logic of your argument? No, not at all. Actually, there is a right to terminate. However, as is the law of the land and so far as the DeClua decision and even the decision of this Court recognizing DeClua and CEK mechanical, that an employer cannot unilaterally repudiate, nor can a union unilaterally repudiate an 8F agreement, typically seen in the construction world. What that means is that to the extent that you provide timely notice, that would constitute a termination. However, the termination is not effective until the end of that particular Collective Bargain Agreement. And in this particular case here, this is point number two in terms of the obligation or the right of the benefit funds to audit here. Even if it was somehow determined that the April 4th, or rather April 3rd, 2007 letter that was never sent to the union constitutes termination. Even if. The case law is quite clear that a benefit fund nonetheless has a continuing ability to audit an employer in this situation through the period in which it is obligated to provide contributions, which in this case again consistent with DeClua, consistent with CEK, runs through August 31st, 2009, the final date of the Collective Bargain Agreement, the expiration date. So, if nothing else, the benefit funds were certainly entitled as a matter of law to an audit for that period. Can you tell me what the functional value of termination prior to expiration is if termination can't take effect until the expiration date? The functional value of the termination is that upon the, because each of these agreements has an evergreen clause. So, to the extent that, an evergreen clause, excuse me. So, to the extent that a party does not terminate within the time frame, they're automatically re-upped going forward. So, I'm sorry, I should have brought that up earlier. You can keep going on. Okay, thank you. So, that is in fact the nature of the, or the benefit of the termination in which the courts have recognized, you know, part of the bargain here in terms of getting into an agreement like this is obviously two-sided when it comes to collective bargaining. For one party to simply step aside at any point midway through a contract, again which is So, just so I understand, that means if you don't terminate before the expiration date, the next time you can terminate, you're locked in to the agreement to the next. That's correct. And how does the next expiration date get determined in an evergreen contract? Does it specify what the next length of the CBA will be? No. No, it's bargained. It's bargained by the parties and there will be a, and then the I don't get it. If there's no subsequent termination date, then aren't you saying that if, expiration date, Rob, then aren't you saying that if you don't terminate effective on that stated expiration date, you're like the guy caught in the MTA. You will travel forever under that collective bargaining agreement. No, Your Honor, I'm not. Then I don't understand how you get out, how they get out of it. No, but I will submit to the court that there's significant case law out there concerning evergreen clauses and their use in the construction industry and how termination agreements function in that respect. So my point in terms of addressing, or rather let me address your question, is that these contracts ultimately get negotiated and there is, each one of these contracts is for a definite period of time, but there's a termination language which each and every And to the extent that they don't as a matter of contract, then they are bound by the following contract. I see, forever until they negotiate something better than, shorter than forever. Is that the idea? I mean, what would happen if I don't terminate? Yes. The contract expires. Yes. Under the evergreen clause, I'm automatically in the new, the same contract again, with no termination date unless I bargained to get a, no expiration date unless I bargained for one? No, you'll see here within the record that the collective bargaining agreement here is between the New England Regional Council of Carpenters and various large employer associations. For example, the Associated General Contracts Association, etc. They meet on a periodic basis, usually every three years normally, but sometimes every four years depending on the length of the contract to negotiate new terms for a collective bargaining agreement, which include, each one of them includes an expiration date or expiration provision. And it would be that agreement, that subsequent agreement, which any other member of that association, for example, or any other contractor which voluntarily decides to be bound by this agreement, by the state letter, would have to adhere to the terms. So, I mean, to the extent they miss an opportunity to terminate during this current agreement, which is not the case here. We're not arguing that this letter would have been untimely. Nonetheless, if it was untimely or there was no termination, then yes, they would be bound by the subsequent, the subsequent collective bargaining agreement. It would have to terminate consistent with the termination clause within that agreement. So, I want to understand the scope of your audit demand here. I thought at one point you were saying that your audit demand only extends through August 31, 2009. But in the history of this case, you were demanding audits through 2011 or 2012. What is the scope of your audit demand now? The current scope of the audit demand is January 1, 2007 through August 31, 2011. But you're absolutely correct. It was expanded at one point based upon the fact that the employer refused to submit to the audit. Time went on. And at that point, as you'll see in the record, it's pretty typical that employers are expanding their orders approximately. So, as time went on, the random audit period, subsequent random audit period came up and the audit period was expanded. And that's because even as of today, they have never effectively terminated their relationship to this collective bargaining agreement? Is that your position? It is our position. Even now? Even now. Even now. Thank you. May it please the Court. Good morning, Your Honors. My name is Mark Ventola and with me is my colleague David Hanson. Together we represent the appellee in this case, Labonte Drywall. And we're here today asking the Court to affirm Judge Stern's decision after trial in this case where he made, in our view, three distinct and came to three distinct conclusions. The first was that notice of termination of this contract had, in fact, been given and had, in fact, been received by the agency, the collection agency, the benefit funds, and the union. Second, he determined that the substance of the notice itself was sufficient to convey the intent to terminate the agreement. And then third, he reached the conclusion about when it was, in fact, that this agreement had been terminated, the issue that the Court was just inquiring about. In our view, the first determination, the one about notice and whether it had, in fact, been delivered and received was one entirely of fact. That determination was based upon the testimony and the conduct of the parties. The testimony of Mr. Labonte, Danny Labonte, about having sent this letter, signed this letter, and, in fact, mailed it to Mr. Donohue. The conclusion was supported by, as the Court has surmised, the conduct of the parties here after that notice was sent. Now, Mr. Donohue was an example of the testimony that the employees of the fund and the union who testified about how they would interact with each other and the frequency of their interaction. The first point was that these parties were in regular communication. In fact, the union employee who testified, Mr. Pacaro, referred to it as very regular communication about a host of issues. For example, the agency itself would notify the union if any employers were delinquent in terms of making their contributions to the fund. The agency would go further at times and notify the union if there were delinquencies that were serious that this employer should be cut off from labor. The union would talk to the agency about changes in employer status. The union would involve the agency in its audit request. There was this letter from the union to Labonte with this long questionnaire that's in the record. Is there any evidence in the record that they were in contact about termination decisions? Testimony, no. Conduct, yes. Well, just on the test, there's no, when you say the regular contact between the two, related to all kinds of things that one would expect the fund and the union to be in contact about. But the issue is, since the agreement suggests that you have to give termination notice to the union, why does the fact that the union and the fund were on contact regularly about things unrelated to termination tell you that when you give notice to the fund of termination, you notified the union? Sure, I may have misunderstood the question, but there was, in fact, testimony that, in general, there is communication between the fund, the agency, and the union about matters of termination. There was no specific testimony about communication in this case. What we have is the testimony about the letter itself and then the conduct of the parties, and the credibility determination, as Judge Stearns referred to it, the credibility determination he made based upon the conduct of the parties after the letter was sent, that, from which he concluded that, in fact, notice had been given in this case. Counsel, am I correct? Pellin said he doesn't recall anything in the record. I thought I read in the briefs that there were, in fact, letters from the union to Labonte asking Labonte to rejoin the statewide agreement. Were there such letters? There was not a letter, Your Honor. There was a visit or visits from the union to Mr. Labonte asking him to rejoin. And, in particular, because counsel referred to it, the testimony, on page 409 of the joint appendix, which is page 94 of the transcript, there was a question asked of Mr. Labonte who said, were those visits, the question was, were those visits to Labonte Drywall or to another company? Because Danny Labonte is not an employee of Labonte Drywall. It's his father's company, Claremont Labonte. Mr. Danny Labonte owned a different company close by, next door, and had the authority to act for his father who speaks the record will show, speaks limited English, and really didn't understand a lot of things about business. So Danny Labonte was visited by the union to Labonte Drywall and to CBD, which was his company. So they were to both. And that's what Mr. Labonte testified to. And I think that one point is probably of the matters involving conduct and the evidence we had about the conduct of the parties. That one was the most startling and the most important because we have evidence that the union was visiting Labonte Drywall, asking Labonte Drywall to be doing that. So we have that coupled with a whole host of other conduct. We had the union stop sending copies of the collective bargaining agreement to Labonte Drywall. We had the union stop sending these wage summaries. They would every so often send out summaries of the wage and benefit packages that contractors were required to pay to employees so that the contractors could use them in their bidding process. We had the benefit funds stop sending out. They would send out similar summaries about how much the benefits costs were so that they could be built into estimates and bidding. That stopped. All of this stopped. And the case law on this point is clear that the conduct of the parties can be considered in making these determinations about whether there was in fact a termination. And there were two cases. One decided in the First Circuit and the Hare Brothers case, which was decided by the Third Circuit, both of which suggest strongly that the conduct of the parties can and should be considered as being either consistent or inconsistent with a termination. So it's not just the letter itself and what the letter says, but the legal separateness of all of these entities, the fund, the union, and the agency. And I would say, and we've argued in our brief, that that point is really mistaken. It's sort of a red herring in the sense that all Judge Stearns found was that the union somehow received notice, had actual notice, based upon the fact that the letter was written and the conduct. He was not suggesting that there was somehow an agency relationship between the two. Although I would say to the Court as well that even the cases cited by the appellant do, and one of them is the Griffith case and the other is the Augers case, do suggest that under the right set of facts and circumstances, a gentleman such as Mr. Donohue who works for the fund can't, and the agency can, in fact, be an agent for the union. It's a factual determination that would have to be made. Now in those cases the Court decided there were not sufficient facts, both decided on summary judgment, there were not sufficient facts presented to allow the Court to make that agency determination, but on the right case that can be done. Counsel, the statewide agreement, when it talks about the right of Labonte to provide notice of termination, specifically says that it's notice of termination in accordance with the applicable notice provision of the collective bargaining agreement. You go to the collective bargaining agreement and by its terms it does not provide for any termination prior to August 31, 2009. So how, in light of the relationship between those two provisions, can you argue that Labonte could terminate in April of 2007? That goes to the third point, which the judge concluded, which is when, in fact, was this agreement terminated. And the reason I can say that, Your Honor, is this. If we read the statewide agreement, this paragraph 2 in it, and this is at page 19 of the joint appendix, it says the duration of the statewide agreement shall be coextensive with the terms set out in the collective in accordance with the applicable collective bargaining agreement. Now, I have to believe that a document and a phrase like this and a paragraph like this, every word has meaning. If you read this paragraph the way the appellant would have you read it, both phrases mean the exact same thing. Both phrases mean the duration of this is coextensive with the collective bargaining agreement unless this is coextensive with the collective bargaining agreement. The second phrase, the unless phrase, has to mean something. And in our view, this is very unique. The statewide agreement here is a unique document in terms of the way it's written. It was written and signed. It was signed in 1996. I think it was written sometime before that. And in our view, to understand why it is that we're saying you can terminate when it was... You mean it's unique? You mean it's poorly written? Is that what you mean? It could be more clear. It is, I think, unique because you don't commonly see this ability to terminate just on notice. Tell us what unless does mean. We're saying unless you give notice that you would like to terminate the agreement. Unless you give notice. You can terminate in accordance with... It will terminate in accordance with the provisions of the collective bargaining agreement, which call for a termination at the end of a specific period of time. Or you can terminate earlier if you give notice of termination early. And notice refers... Gives notice, in effect, refers to the mechanics of doing it. Yes. And now that may seem a bit extreme, but if we look at... This is a pre-hire agreement controlled by the DeClua case, which was decided and means now that in order to terminate, you must wait until the end of the collective bargaining agreement. But prior to that, prior to the DeClua case, the settled law in this area was with these types of pre-hire agreements, either party could terminate on notice. So that's not a foreign concept at all or an extreme concept in the law of collective bargaining agreements. That was the law that existed in these pre-hire agreements prior to the DeClua decision. So it's not at all surprising in our view that that concept is built into a document that was drafted around that period of time. Okay. So I understand the significance of this particular argument. If there was no statewide agreement and all we have is the language of the CBA, you would accept that you couldn't terminate prior to 2009? Correct. That's what the agreement... That's what the CBA says. So is it... Is there authority that allows the statewide agreement to supersede and reform the requirements of the CBA? There are cases, Your Honor, and we've cited them that say, in essence, these are nothing more than contracts. The fact that they're labor contracts doesn't make them anything special. They are, in fact, contracts. And there are cases that we've cited that say that the matter of contract law is supposed to be decided based upon state law, not based upon any special... I can understand that the statewide agreement could mean very much how you want it to mean, right? But I guess my question is, there's still the CBA with its termination requirements. Correct. And I'm asking, is there authority that suggests that a statewide agreement can effectively revise a requirement in the CBA? Supersede. I'm not aware of any, and that's not really a question we addressed in our brief. If that weren't true, if you couldn't, through the statewide agreement, revise the CBA, how do we get around the fact that the CBA, as you concede, if it was just standing alone, does not permit termination prior to 2009? I guess the way I would look at it is this. That collective bargaining agreement itself is a large document that's negotiated by a multi-employer group with the labor union. And it existed before Labonte became a union member. The way that Labonte became a union company was by signing this one-page statewide agreement, which sort of sits on top of the collective bargaining agreement. I mean, they're not a signatory of the collective bargaining agreement at all, right? Correct. All that's binding them is the statewide agreement. Correct. It's this one-page agreement that says you now are going to be bound by that separate collective bargaining agreement. So your argument is that the statewide agreement is somehow establishing a distinct termination date from the CBA, then the CBA itself sets? Correct. That's correct. And I would say that Or at least a distinct determination mechanism. Yes. Yeah. And because this statewide agreement is specific to Labonte, whereas the collective bargaining agreement applies broadly to many employers, and this is the document, the statewide agreement is the one that's specific to Labonte, it's the one that should control when it is more specific, and in this case with respect to termination. I see that my time is just about up, so in the absence of any further questions, I would ask the Court to simply affirm Judge Stern's decision in behalf of Labonte. Thank you. Thank you, Your Honors. I'll be brief just to address a few points. But as I take away from my brother's comments that he, in effect, seeks to or requests that this Court overturn the law of the CLUA and of CEK. And here we are dealing with two different documents, however they're integrated. And the statewide agreement by itself in paragraph one refers specifically that the employer, in this case Labonte, accepts and agrees to abide by the collective bargaining agreements between the various contractor associations and the unions of the United Brotherhoods of Carpenters and Joiners of America, so forth and so on. It agrees that it shall abide by any amendments or successor agreements negotiated by the contractor associations and the local unions. If those contracts expire and a successor agreement has not been negotiated, the terms of the previous agreement shall continue in effect until a successor agreement is reached. And then, of course, we get in, as Judge Lopez quoted earlier, paragraph number two of the statewide agreement which concerns the duration, which is, for lack of a better word, strictly a piggyback provision in terms of you need to look to the collective bargaining agreement in effect. So there's no reason to draw a separate analysis here. But it can also be read to mean you need to look to the collective bargaining agreement if you do not do something else. If you do not do something else. Because there's an implication in the sentence in two that there can be a termination date different from that of the collective bargaining agreement. Well, counsel, if I could just add to Justice Souter's question. If you don't take the view that Justice Souter's question suggests, what is the meaning, what purpose does that paragraph two serve? It serves to emphasize that termination, which of course is a significant issue in any context like this whenever you have an 8F agreement, is referred to within the larger collective bargaining agreement. It speaks specifically to the fact that to the extent that the, unless either party to the statewide agreement gives notice of termination of this agreement in accordance with the applicable notice provisions of the collective bargaining agreement referred to in paragraph one. It refers specifically to, in this case here, Article 31 of the collective bargaining agreement. It does, but you're saying that all this extra verbiage simply boils down to saying the termination date is the termination date in accordance or under the collective bargaining agreement. That's correct. That's correct. They certainly found a funny way of putting it. Well, you disagree. But nonetheless, under the, again, the prevailing case law, I would submit to the court respectfully that if nothing else, even if the April 3, 2007 letter, which was never provided to the union directly, was somehow found to constitute sufficient notice, again, the obligations of a volunteer extend through that collective bargaining agreement through August 31, 2009, and the right to audit extends to that period as well. Defined otherwise would take away the right of a benefit fund, or the benefit funds in this case, to conduct closeout audits in the case of an employer that does ultimately decide to terminate, which does happen in this industry. They do sometimes terminate and walk away from collective bargaining agreements. But to the extent that they have continuing obligations under the collective bargaining agreement, benefit funds have to have that ability to review whether or not those obligations have been met. Thank you. I didn't address my final issue in my brief in terms of the latches argument, but I assume if the court has any questions, you'll ask.  All right.